**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DAISY BONES, )
                     Plaintiff, )    Case No. 2:15-cv-01132-GMN-GWF
)
vs. )    **REPORT AND**
)    **RECOMMENDATION**
NANCY A. BERRYHILL, )
Commissioner of Social Security, )
)    Motion for Reversal and/or Remand (#14)
                     Defendant. )    Cross-Motion to Affirm (#15)
)

This case involves judicial review of administrative action by the Commissioner of Social Security denying Plaintiff Daisy Bones' claim for disability benefits under Title II of the Social Security Act. Plaintiff's Complaint (ECF No. 14) was filed June 16, 2015. Defendant's Answer (ECF No. 8) was filed September 28, 2015, as was a certified copy of the Administrative Record (the "A.R."). *(See* ECF No. 9). Plaintiff filed her Motion for Reversal and/or Remand (ECF No. 14) on December 3, 2015. The Commissioner filed her Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal and/or Remand (ECF No. 15) on January 4, 2016. Plaintiff did not file a reply brief. This matter has been submitted to the undersigned United States Magistrate Judge for Findings and Recommendations.

## **BACKGROUND**

**A.    Procedural History.**

On November 18, 2011, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. AR 81. Plaintiff alleged that her disability began on February 11, 2010.[1]

---

[1] At the time of the September 16, 2013 hearing before the ALJ, Plaintiff's counsel did not request a closed period of disability. AR 34. However, in her representative brief to the appeals council dated January 6, 2014, Plaintiff's counsel stated that Plaintiff was "alleging disability beginning February 11, 2010 through May 7, 2013." AR 233. This was not an

AR 82. The Social Security Administration denied Plaintiff's claim on April 6, 2012. AR 89. Plaintiff then filed for reconsideration, which was denied on November 9, 2012. AR 91-100. Plaintiff requested a hearing before an Adminstrative Law Jude ("ALJ") and testified at a hearing on September 16, 2013. AR 33-79. Vocational Expert Veriuska Corso also testified at the hearing. AR 65-79. The ALJ determined that Plaintiff was not disabled from her alleged onset date of February 11, 2010. AR 12-24. Plaintiff appealed the decision of the ALJ to the Appeals Council on January 6, 2014. AR 29-30. The Appeals Council denied Plaintiff's request for review on April 16, 2015. AR 3-8. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned magistrate judge for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

### B. Factual Background.

Plaintiff Daisy Bones was born on May 9, 1964. AR 164. She is 5'1" tall and weighed 240 pounds in September 2013. AR 40. Plaintiff obtained an associates degree in electronics in 2008. AR 188. At the time of the hearing, Plaintiff lived in an apartment by herself. AR 37, 210. Prior to that, she lived in a house with her sister and brother-in-law. AR 38.

**1. Plaintiff's Disability/Work History Reports and Hearing Testimony**

In her initial November 2011 disability report, Plaintiff listed arthritis in the knees and spine, cervical and lumbar disc bulges, vertigo and disc degeneration as her disabling conditions. AR 187. She stated that she stopped working on February 11, 2010 because of her conditions. AR 187. From November 2009 through February 2010 Plaintiff performed clerical work, from 1997 to 2000 she was a counselor at a group home, from 1997 to 2009 she was a bus driver, and from 2000 to 2004 she was a driver and counselor for a youth home. AR 188. She was currently taking Acetaminophen, Amitriptyline, Amlodipine, Carisoprodol, Losartan, Nabumetone, Orpenadrine, and Tramadol to help with her pain and blood pressure. AR 190. Plaintiff reported treating at Pacific Orthopedic and Rehab from 2010-2011, David Pechman, M.D. with Tower Orthopedic and Sports from 2009 to 2011, and with Universal Pain Management from 2010-2011. AR 191-194. All providers were in California.

---

issued raised by Plaintiff in her motion for remand and as such, the Court will not address it.

In January 2012, Plaintiff reported that she lived alone in an apartment. AR 210. Plaintiff explained that her knee pain made it difficult to walk, that the range of motion in her neck was severely limited due to her neck pain, and that she suffered from continuous back spasms. She did not participate in any activities because of her pain and reported that walking to her car (approximately twenty feet) was difficult and would cause severe pain. Plaintiff could lift groceries that weighed up to 5 pounds and only carry them to and from her car. AR 211. Her son would clean her house and she would only drive a car to the grocery store and to doctor appointments. Cooking took a lot longer because she had to stop when the pain in her knee and back became severe. AR 212. Plaintiff reported sleeping only four hours, which was interrupted by pain. She also took two, thirty minute naps a day. AR 212.

Plaintiff completed a second disability report in April 2012. AR 216-221. Plaintiff reported that since her last report, her conditions had worsened to the point that she needed surgery. She was diagnosed with Ossification of the Posterior Longitudinal Ligament ("OPLL") in her right knee. AR 216. Since her last report, Plaintiff treated with Gabriel Rubanenko, M.D. and Gil Tepper, M.D. AR 217. She reported taking Amlodipine, Cozar, Ibuprofen, and Tramadol. AR 218. Plaintiff reported that standing made her tired and that "things take longer to do." AR 219. Plaintiff completed a third disability report in December 2012. AR 224-229. She reported that there had been no changes since her last report. AR 224. Plaintiff had seen Marvin Pietruszka, M.D. for an EKG and to check on her high blood pressure. AR 225. She also received physical therapy for her neck, back and knee pain. AR 226. Plaintiff reported taking Amlodipine, Carisoprodol, Cazar, Diazepan, Flurbiprofen, Gabapentin, Hydro/APAP, Hydrocodone, Ibuprofen, Naxproxen Sodium, Oxaprozin, and Tramadol. AR 227. Plaintiff needed help cooking, cleaning, and carrying heavy objects. She was unable to sit for long period of time, could not stand or walk for long periods of time, and had severe pain and swelling throughout her body when it was cold. AR 228.

Plaintiff testified at the September 16, 2013 hearing that she currently lived in a first floor apartment in Henderson, NV. AR 37. Plaintiff previously lived in two-story house with her sister and brother-in-law. She had an associates degree in electronics, which prepared her to fix computers. AR 38. Plaintiff never actually used her degree for employment. Plaintiff did not smoke. AR 50-51.

Plaintiff testified that since May 7, 2013 she worked as a bus driver for a small bus company in Boulder City. AR 39. She had stopped working as a bus driver in 2010 due to the pain caused by injuries to her knees, back and neck. These injuries developed over time and were not caused by a specific accident. AR 40. Plaintiff experienced pain in her shoulders, knees and back. AR 54. She had spasms and sharp pains in her knees that were alleviated with medication and massage. The medication made her "a little loopy." AR 55. Plaintiff also suffered from vertigo, which stopped after her neck surgery. AR 56. Before her neck surgery, Plaintiff would get dizzy every two to three months and it could last a day or an entire week. AR 56. In or around November 2009, she was put on light duty for three months. AR 44-45. While on light duty, Plaintiff did clerical work such as answering phones and sorting papers. AR 60-61. Plaintiff received workers compensation benefits until shortly before the hearing. AR 49.

Plaintiff testified that she gradually lost 35 pounds during the three preceding years. AR 40. When she was not working, she would be at home laying down and trying to recuperate. AR 47. She would do some light chores, such as straighten up the house, sweep, and occasionally mop. She cooked for herself and did her own laundry. AR 48. Prior to her surgeries, Plaintiff's son drove her to the supermarket, pushed the shopping cart and assisted her in walking if she was not hanging onto the cart. AR 52-53. After the surgeries, she could drive herself to the supermarket every other week to buy groceries. AR 48. Her pain would awaken her at night and she would have to get up to take medication. AR 54-55. She napped "all the time" with pillows under her legs. Plaintiff did not engage in regular social activities with family and friends. AR 55.

Plaintiff testified that after her knee surgeries, she could stand in one place for about an hour at a time prior to experiencing knee pain. AR 49-50. Before the surgeries, she could only stand in one place for fifteen minutes at a time, sit for fifteen to twenty minutes and walk a couple of feet before having to take a break. AR 50-52. Plaintiff testified that before her surgeries, she had difficulty reaching above her head, could only lift five to ten pounds, could not get in or out of a praying position without help, and could not pick up keys from the floor without discomfort. AR 53-54. She could only keep her neck in one position for about ten to fifteen minutes before her shoulder and neck pain would become too painful. AR 54. Before her knee surgery, Plaintiff used a cane all the time. After her

surgery, she used a cane when she walked too much and the pain became too painful. AR 46. Plaintiff testified that since her surgeries, she feels better but still suffers from pain. The pain is more tolerable and she continues to take medication. AR 57.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Veriuska Corso testified at the September 16, 2013 hearing. After establishing Plaintiff's prior work as a residential counselor (sedentary work), driver/bus driver (medium work), and receptionist (sedentary work), AR 65-66, the ALJ asked the VE the following hypothetical question:

> If we had a person with the claimant's age, education, and experience being capable of working at the light exertional level so that would eliminate the driver and bus driver . . . [w]ith all posturals only occasional. Only occasional rotation, flexion, or extension of the neck. And would also need to avoid exposure to excessive vibration. With those limitations could such a person work as a residential counselor? . . . [and] a receptionist?

AR 66-67

The VE responded that the hypothetical person would be able to work as a residential counselor and as a receptionist with an erosion of twenty (20) percent. AR 67. The ALJ asked whether there are other jobs the person could perform at the light exertional level. The VE testified that the person could work as a box office cashier/ticket seller (19,315 jobs in the national economy), cashier II (817,195 jobs in the national economy), ticket taker (6,826 jobs in the national economy), and parking lot attendant (22,018 jobs in the national economy). AR 67-68. The VE also testified that the person could hold the following sedentary jobs: callout operator (8,316 jobs in the national economy), telephone information clerk (3,422 jobs in the national economy), and charge account clerk (2,281 jobs in the national economy) with a twenty-five (25) percent erosion due to neck rotation, extension, et cetera. AR 68-69.

Plaintiff's counsel asked Plaintiff if she was ever required to physically restrain the children while she was a residential counselor. She responded that she was sometimes required to restrain them. AR 69. Based on this fact, Plaintiff's counsel asked the VE whether the occupation of residential counselor would still be defined as sedentary. The VE testified that as performed, the job would be at the light exertional level. AR 69-71. Plaintiff's counsel also asked how often an individual working as a box officer cashier, cashier II, ticket taker, parking lot attendant, callout operator, telephone

information clerk, and charge account clerk would have to bend their neck down, back or sideways. The VE responded that it would be only one-third of the work day. AR 73. Plaintiff's counsel asked whether any of the jobs noted by the VE would be eliminated or substantially reduced if an individual had to be off task for fifteen (15) percent of the day due to pain or had to miss more than three days of work per month. AR 74. The VE responded that it would. Counsel asked if the sedentary jobs would be eliminated if the individual could only sit for fifteen (15) minutes at a time. Again, the VE responded that it would. Finally, counsel asked if the light duty jobs would be eliminated if the individual could not stand for six out of eight hours in a day. AR 74-75. The VE responded that if the individual required a sit/stand job, she could still work as a box office cashier and cashier II with a thirty (30) percent erosion. AR 75. However, if the individual was required to walk around, those jobs would be eliminated. AR 76.

### 3. Medical Records and Reports:

Plaintiff was primarily seen by Gabriel V. Rubanenko, M.D., a workers' compensation orthopedist, beginning in January 2010. She complained of neck, bilateral shoulder, mid back, lower back and bilateral knee pain. *See generally* AR 136-446. At her initial examination, Plaintiff advised that her job duties included continuous sitting, intermittent walking, intermittent standing, and intermittent twisting. AR 563. The job required her to use her hands but did not require reaching above shoulder level. AR 564. A physical evaluation revealed findings of tenderness to palpation over the spinal processes C5-C7, limited range of motion, spasms, and a positive compression test; tenderness to palpation of the thoracic spinal processes, T1 through T9, and limited range of motion; tenderness to palpation of the lumbar spinal processes, L1 through L5, spasms and a limited range of motion; positive straight leg raising tests; tenderness to palpation over the lateral aspect of the right shoulder; tenderness to palpation along the bilateral knee joints and restricted flexion and extension; and a positive McMurray's maneuver. AR 569-576. Dr. Rubanenko treated Plaintiff with oral medications, such as Tramadol and Soma. AR 577. Dr. Rubanenko noted these same findings after Plaintiff's physical examination on February 11, 2010. AR 559-561.

Plaintiff underwent MRIs of her cervical and thoracic spine on February 16, 2010. The MRIs showed disc protrusion/extrusion at C3-C4, disc extrusion at C4-C5, disc protrusion at C5-C6, reversal

of lordosis from C3-C6, and mild spinal canal stenosis at T7-T8. AR 724-727. Following Plaintiff's MRI, Dr. Rubanenko diagnosed Plaintiff with cervical spine disc protrusion with radiculitis, thoracic spine sprain/strain, lumbar spine sprain/strain, and bilateral knee osteoarthritis and meniscus tears. AR 555. Plaintiff was prescribed additional physical therapy and steroid injections into her knees. Dr. Rubanenko's evaluations of Plaintiff from April 2010 through November 2011 were largely consistent with his prior evaluations and treatment recommendations. AR 447-553.

An MRI of Plaintiff's cervical spine, performed on April 7, 2010, revealed moderate to severe left neural foraminal narrowing at C5-6 and C4-5 as well as moderate central canal and moderate bilateral neural foraminal narrowing. It also showed ossification of the posterior longitudinal ligament at C3-4, C4-5 and C5-6. AR 606-607, 721-722. An MRI of Plaintiff's thoracic spine revealed multilevel mild-moderate chronic degenerative changes of the thoracic spine. AR 723.

Plaintiff presented to Lana Geyber, M.D. on February 4, 2010. Plaintiff complained of neck, shoulder, back and knee pain caused by her daily activities as a bus driver. AR 237. She also reported a history of hypertension. AR 238. Upon physical examination, Dr. Geyber found that Plaintiff was in no acute distress and diagnosed her with hypertension. AR 239-240, 622-623. Dr. Geyber saw Plaintiff again on November 23, 2011. AR 625. Plaintiff complained of left knee pain. Dr. Geyber noted that Plaintiff was in no acute distress but that she suffered from a left knee meniscal tear and cleared her for elective surgery. AR 627-628.

Plaintiff presented to Omid Mahgerefteh, DC at Universal Pain Management on June 15, 2010. AR 438. Plaintiff complained of constant neck pain, low back pain and bilateral knee pain that interfered with her work and daily sleep routine. Dr. Mahgerefteh found that Plaintiff had moderate pain in her cervical and lumbar spine, with normal range of motion in both knees. AR 439-440. Dr. Mahgerefteh recommended that Plaintiff begin a course of physical medicine including chiropractic manipulation, electrical muscle stimulation, myofascial release, therapeutic exercise and infrared therapy. AR 440.

From November 2010 through September 2011, Plaintiff underwent several Agreed Medical

Examinations.[2] Plaintiff primarily complained of neck pain, mid and low back pain, and bilateral knee pain. AR 274-275, 290-291, 361-362. During a November 4, 2010 physical examination, Dr. Pechman documented the following positive findings: decreased cervical extension and rotation; decreased lumbar extension and lateral flexion; palpable tenderness of the mid-back; and bilateral patellofemoral creptation. AR 368-371. All other findings were negative. Dr. Pechman diagnosed spinal stenosis at C4-5 and C5-6 (per the MRI scan), thoracic disc degeneration without disc herniation and bilateral knee arthritis with medial compartment narrowing to 3mm. AR 373. He concluded that Plaintiff was not stationary and permanent at that time. AR 374. Dr. Pechman recommended future therapy and medications, as well as Synvisc injections for bilateral knee pain. AR 375.

Dr. Pechman again evaluated Plaintiff on April 12, 2011. He found that Plaintiff was not permanent and stationary and required a course of treatment. AR 286. She was to avoid heavy work activities. Plaintiff had full range of motion in her lumbar spine and Dr. Pechman found no indication for lumbar spine surgery or other invasive procedures. AR 287.

Dr. Pechman examined Plaintiff on September 20, 2011. AR. 289. He diagnosed cervical discogenic disease, thoracic discogenic disease without disc herniation, lumbosacral discogenic disease and bilateral knee arthritis. AR 306. Dr. Pechman stated that Plaintiff "ha[d] a fairly high level of impairment/disability. The herniated disc issues in the neck would be of particular concern as to whether she could safely operate a bus and be responsible for large numbers of passengers." AR 311. Plaintiff required additional physical therapy and medications to address her cervical spine, thoracic spine, lumbar spine and bilateral knee problems.

Plaintiff was seen by F. Marina Russman, M.D. on February 7, 2011 for her cervical spine pain. AR 257. Plaintiff complained of constant neck pain, which she described as "sharp, aching, pressure and tension." AR 258. Dr. Russman summarized the results of Plaintiff's cervical spine MRI and diagnosed her with cervical spinal/neuroforaminal stenosis, uncovertebral/facet hypertrophy syndrome and myalgia. AR 259-260. Dr. Russman stated that Plaintiff was "a candidate for a cervical epidural

---

[2] As noted by the ALJ, these are medical examinations performed by a neutral physician in the context of a workers' compensation claim.

steroid injection with bilateral C2-3, C3-4, C4-5, C5-6 and C6-7 facet blocks with the possibility for procedure modification based on intra-operative 3D fluoroscopic findings." AR 260.  Plaintiff's disability status was deferred to her primary treating physician, Dr. Rubanenko.  On March 24, 2011, April 14, 2011 and April 28, 2011 Plaintiff received therapeutic epidural administrations of Kenalog, lidocain, and Wydase for analgesia and a therapeutic percutaneous epidural decompression neuroplasty of the cervical nerve roots for analgesia bilaterally at C2, C3, C4, C5, C6, and C7.  AR 593.  Plaintiff also received bilateral facet blocks at C2-3, C3-4, C4-5, C5-6, C6-7 and C7-T1.  AR 262.

Dr. Lee filled out a musculoskeletal report on behalf of Dr. Rubanenko on January 19, 2012.  AR 587-590.  Dr. Lee noted that Plaintiff was status post left knee arthroscopic surgery on February 12, 2011.  AR 588.  She had decreased range of motion of the left knee, cervical spine, thoracic spine, and lumbar spine.  There was swelling, warmth and redness over the left knee and tenderness over the neck, back and left knee.  AR 587.  She had a paravertebral muscle spasms and 4/5 motor strength of the knees.  Dr. Lee noted weakness in Plaintiff's shoulders and stated that she should not lift objects over 20 pounds and should not reach overhead and/or shoulder level.  AR 588.  He also stated that Plaintiff was improving and recovering.

Homayoun Saeid, M.D. completed a consultative internal medicine evaluation of Plaintiff on March 16, 2012.  Plaintiff complained of bilateral knee and lower back pain.  AR 641.  A physical examination revealed positive findings including: tenderness in the midline and paraspinal areas and limited range of motion of the lumbar spine as well as tenderness, crepitus, and decreased range of motion of the bilateral knees.  AR 642-645.  The remainder of the exam was normal.  Dr. Saeid stated that Plaintiff was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently.  She could stand or walk for six hours in an eight-hour day and sit for six hours in an eight-hour work day.  AR 645.  X-rays, dated March 16, 2012, revealed evidence of lumbar spondylosis with marked disc degeneration from L4 to S1 and facet joint arthritis from L3-L4 to L5-S1.  AR 647.  There was moderate right knee osteoarthritis.

Plaintiff was also treated by Gil Tepper, M.D., a workers' compensation orthopedist.  Plaintiff presented to Dr. Tepper on March 13, 2012 with complaints of neck, mid back and lower back pain.  AR 794-795.  Physical examination revealed neck spasms, limited range of motion, and tenderness at

the trapezius and levator scapulae; positive Spurling's test and cervical compression test, 1+ relexes of brachioradialis, and diffuse tenderness, spasms, and limited range of motion in the lumbar spine. AR 796-799. Dr. Tepper diagnosed disc protrusions at C3-4, C4-5, and C5-6, disc fragments with cord compression, and intractable neck and upper extremity pain. AR 801. He noted that Plaintiff had received conservative care for the past two years. He stated that Plaintiff had critical cervical stenosis and should be considered a surgical candidate. He recommended that MRI and CT scans be obtained prior to surgical intervention. AR 802.

Dr. Tepper provided a progress report on April 10, 2012, which was consistent with his March 2012 findings. AR 804-806. However, Dr. Tepper reviewed a March 12, 2012 CT and diagnosed ossification of the posterior longitudinal ligament at C3-6. AR 804; *see* AR 651-655 for findings of the x-ray and MRI of the cervical spine. AR 807-810.

On June 29, 2012, Dr. Tepper performed an anterior cervical corpectomy, decompression and fusion of the claimant's cervical spine. Plaintiff presented for post operative evaluation on July 10, 2012 at which time Dr. Tepper noted that the x-rays of the revealed excellent positioning of the plate and grafts. AR 677-679; 811-812. Because Plaintiff was still in the early postoperative phase it was too soon to determine if the surgery was beneficial. AR 811. On July 17, 2012, Plaintiff reported that the surgery had helped her pain level by "30%". AR 813. Plaintiff was given oral medication to help with her pain. AR 815. She was advised to continue walking but refrain from overhead activity. AR 815. Dr. Tepper continually noted that Plaintiff was stable and improving. AR 811-820. In September 2012, Plaintiff reported feeling "70%" better. Dr. Tepper again noted that the screws and graft were in excellent position. AR 819. In October 2012, Plaintiff reported feeling "80%" better. AR 763. Dr. Tepper cleared Plaintiff for physical therapy to be conducted 2-3 times per week. Plaintiff was also instructed to engage in aquatic therapy. AR 763. In a progress report dated January 22, 2013, Plaintiff reported being "very pleased with the results and she is making good progress." AR 840. Dr. Tepper noted that Plaintiff was doing well and "plateaued with her recovery." AR 840. Plaintiff engaged in a course of physical therapy at Kinetix Advance Physical Therapy from October 4, 2012 through November 26, 2012. AR 853-899.

Dr. Rubanenko submitted a treating source statement on January 24, 2013. AR 900. He stated

that Plaintiff was temporary totally disabled and required future medical treatment. He restricted her to lifting no more than 15 pounds from the floor, or over shoulder level, or with trunk twisting. Plaintiff was not to flex, extend, rotate, or laterally bend her head and neck. She should not bend, stoop, squat or kneel. AR 900.

**C.     ALJ's Decision.**

In his November 7, 2013 decision, the ALJ determined that Plaintiff was not disabled from February 11, 2010, though the date of the decision because Plaintiff possessed the residual functional capacity ("RFC") to perform light work as defined in the Dictionary of Occupational Titles and the Social Security Regulations. AR 16. In reaching this conclusion, the ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f). First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged amended onset date of February 11, 2010. AR 14. Second, he found that Plaintiff had severe impairments including "disorders of the cervical and lumbar spine status post cervical fusion; and disorders of the knees." AR 14. The ALJ noted that Plaintiff had a history of obesity but found that this condition did not constitute a severe impairment. AR 15. The ALJ further noted that Plaintiff suffered from vertigo and hypertension. He found that these impairments only caused a slight abnormality that would have no more than a minimal effect on Plaintiff's ability to work and were therefore nonsevere. AR 15.

Third, the ALJ found that Plaintiff's impairments did not, individually or in combination, meet the requirements of and were not medically equivalent to any condition listed in Appendix 1, Subpart P, of 20 C.F.R. § 404.1520(c) and § 416.920(c). AR 15.

Prior to step four of the analysis, the ALJ stated that:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for 6 hours out of an 8-hour workday with regular breaks; she can sit for 6 hours out of an 8-hour workday with regular breaks; she can occasionally climb, kneel, balance, stoop, crawl, and crouch; she can occasionally rotate, flex, and extend her neck; and she must avoid concentrated exposure to excessive vibration.

AR 16.

The ALJ found that Plaintiff's allegations concerning the intensity, persistence, and limiting

effects of her back, neck, and knee pain were not fully credible because they were inconsistent with the objective medical evidence. AR 17. In support of this finding, the ALJ noted that the activities Plaintiff testified she was able to perform were not as limiting as one would expect given Plaintiff's complaints of disabling symptoms. Her ability to do laundry, cook, sweep, mop and drive, as well as her ability to stand for an hour and lift 20 pounds undermined her allegations of disabling symptoms. In addition, the ALJ noted that since Plaintiff's neck surgery, "only benign findings were documented." AR 17. In regard to Plaintiff's knee injuries, the ALJ found that she "has not generally received the type of medical treatment one would expect for a totally disabled individual." AR 18. These findings, combined with the fact that Plaintiff returned to work on May 7, 2013, led the ALJ to conclude that she was not entirely credible.

The ALJ summarized the findings of workers' compensation physician, F. Marina Russman, M.D. He noted that Dr. Russman found that Plaintiff had tenderness to palpation along the bilateral trapezius, left scapular region, and right anterior shoulder. AR 18. Plaintiff also had a decreased cervical range of motion. However, the remainder of Plaintiff's examination was normal. The ALJ then discussed the finds of Gabriel V. Rubanenko, M.D., a workers' compensation orthopedist. He noted that Dr. Rubanenko conservatively treated Plaintiff with oral medications, advised her to continue physical therapy and concluded that she could return to modified work. AR 19. The ALJ then discussed Plaintiff's treatment with Gil Tepper, M.D., another workers' compensation orthopedist. Dr. Tepper also conservatively treated Plaintiff's injuries with epidural steroid injections and facet blocks. In 2012, Dr. Tepper performed a decompression and fusion of Plaintiff's cervical spine. AR 19. Following the surgery, Plaintiff reported feeling "80%" better and her physical examination was consistent with that assessment.

The ALJ discussed the Agreed Medical Examinations conducted by David B. Pechman, M.D. from November 4, 2010 to September 20, 2011. AR 20. Plaintiff complained of neck, back, and bilateral knee pain. Dr. Pechman ultimately concluded that Plaintiff had a "fairly high level of impairment/disability." AR 20, 311. The ALJ noted the consultative evaluation completed by Homayoun Saied, M.D. He diagnosed Plaintiff with bilateral knee and lower back pain. AR 21.

Finally, the ALJ discussed the opinion of Dr. Lee from January 2010.[3] Specifically, the ALJ noted that "Dr. Lee opined the [Plaintiff] cannot lift more than 20 pounds and she cannot reach over shoulder level." AR 21.

The ALJ found that the foregoing medical opinions were generally consistent with one another in that they all found that Plaintiff could perform light exertional work to some extent. The opinions differed only in the degree of specific function-by-function limitations. AR 21. The ALJ did not completely adopt any single assessment. Rather, he adopted the specific restrictions on a function-by-function basis that were best supported by the objective medical evidence. AR 21. The ALJ rejected the opinions of the workers' compensation physicians, who stated that Plaintiff was "temporarily totally disabled." He stated that their conclusions had no probative value because the term "temporarily totally disabled" is a term of art in workers' compensation law. AR 21. He did, however, consider the objective medical evidence in making his RFC determination. The ALJ afforded little weight to the disability opinions of the treating workers' compensation physicians on the grounds that they were adversarial in nature and were likely to be biased. AR 21-22.

At step four of the analysis, the ALJ found that Plaintiff was unable to perform any past relevant work. AR 22. He noted that at the time of Plaintiff's alleged disability onset date, she was 45 years old, which is defined as a younger individual. He also found that:

> Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

AR 22.

The ALJ found at step five of the analysis that Plaintiff was capable of performing alternative work that exists in significant numbers in the national economy. AR 22. The ALJ stated that Plaintiff could perform a range of light work, subject to certain physical limitations. AR 23. The ALJ relied on the testimony of the vocational expert that Plaintiff could perform the following jobs: box office

---

[3] It appears that the ALJ incorrectly put January 2010 as the date of Dr. Lee's report. However, that was the date Plaintiff was first seen by Dr. Rubanenko, not the date of the report. Dr. Lee's report was actually made on or around January 19, 2012.

cashier; cashier II; ticket taker; parking attendant; call out operator; telephone information clerk; and charge account clerk. The ALJ therefore concluded that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 23.

## DISCUSSION

### I.   Standard of Review.

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.     Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

## III.    Whether the ALJ erred in rejecting the opinions of Plaintiff's treating physicians

As a general rule, more weight should be given to the opinion of a treating physician than to the opinion of physicians who do not treat the claimant. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The opinion of an examining physician is also generally entitled to greater weight than that of a non-examining physician. *Id.* at 1012, citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The weight afforded to a non-examining physician's opinion depends on the degree to which he provides supporting explanation for his opinions. *Id.* The Commissioner's regulation, 20 C.F.R. § 404.1527(c)(2), states that a treating physician is likely to be "most able to provide a detailed, longitudinal picture of [the claimant's]

15

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations such as consultive examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). If the treating physician's opinion on the nature and severity of the claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record, it will be given controlling weight. *Id.*

Even if the treating physician's opinion is not given controlling weight, the ALJ is required to consider certain factors in determining the weight to be given to the opinion. 20 C.F.R. § 404.1527(c)(2). These factors include (i) the length of the treatment relationship and the frequency of examination and (ii) the nature and extent of the treatment relationship. *Id.* In evaluating the opinions of treating, examining and nonexamining physicians, the ALJ should consider the extent to which the opinion is supported by relevant evidence, particularly medical signs and findings; the extent to which the opinion is consistent with the record as a whole; whether the physician is a specialist opining within the area of his specialty; and other factors, including the physician's familiarity with Social Security disability programs and their evidentiary requirements. 20 C.F.R. § 404.1527(c)(3)-(6).

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence. *Garrison,* 759 F.3d at 1012. "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*, quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). To satisfy the substantial evidence requirement, the ALJ should set forth a detailed and thorough summary of the facts and conflicting clinical evidence, state his interpretations thereof, and make findings. *Id.*, citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct.'" *Id.*

The ALJ is not bound by a treating physician's opinion that a patient is unable to work. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). While a treating physician's evaluation of a patient's ability to work may be useful in the disability determination, a treating physician ordinarily does not

1  consult a vocational consultant or have the expertise of one. "An impairment is a purely medical
2  condition. A disability is an administrative determination of how an impairment in relation to
3  education, age, technological, economic, and social factors, affects the ability to engage in gainful
4  activity." The law reserves the disability determination to the Commissioner. *Id.* at 884, citing 20
5  C.F.R. § 404.1527(e)(1). *See also Kibble v. Comm'r*, 584 Fed.Appx. 717, 719 (9th Cir. Sept. 2, 2014)
6  (unpublished memorandum).

7      Plaintiff argues that the ALJ erred because he failed to provide legitimate reasons for rejecting
8  the opinions of Plaintiff's treating physicians. *Motion for Remand* (ECF No. 14), pg. 3. Specifically,
9  Plaintiff argues that the ALJ improperly rejected Dr. Lee's assessment, that Plaintiff was limited to no
10 movement overhead and/or shoulder level. *Id.* at pg. 6; *see* AR 588. Plaintiff argues that the limitation
11 of no overhead lifting would eliminate Plaintiff's ability to perform any of the jobs identified by the
12 vocational expert. *Id.* at pgs. 7–8; *see Vincent v. Heckler*, 739 F.2d 1393,1394–95 (9th Cir. 1984).
13 Defendant argues that Plaintiff's position is incorrect because the ALJ specifically referenced Dr. Lee's
14 finding concerning overhead reaching in addition to his summary of the pertinent medical evidence,
15 explained the weight he attributed to Dr. Lee's assessment, and set forth specific and legitimate reasons
16 to support his findings. *Response* (ECF No. 15), pg. 4. Defendant relies on *Magallanes v. Bowen*, 881
17 F.2d 747 (9th Cir. 1989) in which the court stated that an ALJ can meet his burden of providing specific
18 and legitimate reasons "by setting out a detailed and thorough summary of the facts and conflicting
19 clinical evidence, stating his interpretation thereof, and making findings." *Id.* at 751 (citing *Cotton v.*
20 *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

21     The ALJ's decision to reject the overhead and/or above shoulder reaching limitation is
22 supported by substantial evidence in the record. Dr. Lee made his physical limitation finding on or
23 about January 19, 2012. Plaintiff was subsequently seen by Dr. Homayoun Saeid on March 16, 2012.
24 AR 641-650. He found that Plaintiff was "capable of lifting and carrying 20 pounds occasionally and
25 10 pounds frequently. She could stand or walk for six hours in an eight-hour day and sit for six hours in
26 an eight-hour work day." AR 645. Dr. Saeid did not assess any limitation in overhead or above
27 shoulder reaching. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (an examining
28 physician's opinion alone constitutes substantial evidence, because it rests on his own independent

examination of the claimant); *see also Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985). In addition, Plaintiff underwent an anterior cervical corpectomy, decompression and fusion of her cervical spine on June 29, 2012. Following that procedure, Dr. Gil Tepper stated that the x-rays of Plaintiff's cervical spine revealed excellent position of the plate and grafts. Plaintiff reported feeling "30%" better in July 2012 and Dr. Tepper advised Plaintiff to restrain from overhead activity at that time. AR 815. However, by October 2012, Plaintiff reported feeling "80%" better, and in January 2013 Dr. Tepper found that Plaintiff was doing well and "plateaued with her recovery." AR 840. Finally, Dr. Rubanenko submitted a treating source statement on January 24, 2013 which only restricted Plaintiff to no lifting over 15 pounds from the floor/over shoulder level/with trunk twisting. He did not find that Plaintiff was restricted from *all* over shoulder level lifting. AR 900.

Plaintiff also argues that the ALJ erred by failing to address the fact that the alternative job of callout operator offered by the vocational expert does not exist in significant numbers in the national economy. Plaintiff relies on *Branch v. Colvin*, which held that the ALJ failed to meet his burden of establishing that other work exists in "significant numbers" because 8,500 jobs does not constitute a significant amount of jobs in the national economy. 2015 WL 5225951, at *7 (D. Nev. Sept. 8, 2015). The Ninth Circuit has never set a "bright-line rule for what constitutes a 'significant number' of jobs." *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528 (9th Cir. 2014). The Ninth Circuit has stated, however, that an occupation with approximately 25,000 in the national economy meets the threshold of what constitutes a "significant number" of jobs. *Id.* at 528–29. Here, the vocational expert testified that a person with Plaintiff's RFC was capable of performing the following jobs: box office cashier/ticket seller (19,315 jobs in the national economy), cashier II (817,195 jobs in the national economy), ticket taker (6,826 jobs in the national economy), and parking lot attendant (22,018 jobs in the national economy), callout operator (8,316 jobs in the national economy), telephone information clerk (3,422 jobs in the national economy), and charge account clerk (2,281 jobs in the national economy). AR 67-69. While several of these occupations do not have significant numbers existing in the national economy, the job as a cashier II far exceeds the minimum threshold described by the Ninth Circuit. In addition, two of the proposed occupations—box office cashier/ticket taker (19,315 jobs) and parking lot attendant (22,018)—are very close to the minimum number that the Ninth Circuit considers

significant. By contrast, the Eight Circuit has found 10,000 jobs in the national economy to be significant. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). Because some of the jobs identified by the vocational expert exist in significant numbers in the national economy, any error by the ALJ regarding the availability of other jobs was harmless.

For these reasons, the Court finds that the ALJ's did not err in reaching his RFC assessment and finds that his decision to reject the overhead/above shoulder level reaching limitation is supported by substantial evidence in the record. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (ECF No. 14) be **denied**, and that the Defendant's Cross Motion to Affirm (ECF No. 15) be **granted**.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 14th day of February, 2017.

**GEORGE FOLEY, JR.**
**United States Magistrate Judge**